AO93 Search and Seizure Warrant

X FILED
___ RECEIVED
___ LODGED
___ COPY

OCT - 4 2024

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT
for the
District of Arizona

IN THE MATTER OF THE SEARCH OF CELLULAR TOWER DATA ASSOCIATED WITH THE MEXICAN CELLULAR TELEPHONE NUMBER 525624603391 AND REGISTERED TO JOSE ANTONIO RAMOS-LEON CURRENTLY LOCATED IN THE POSSESSION OF AT&T MOBILITY, T-MOBILE USA, SPRINT AND VERIZON WIRELESS.

Case No.   24- 2395MB

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Northern District of California:

### As further described in Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal:

### As set forth in Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before ___10-18-2024___ *(not to exceed 14 days)*
☒ in the daytime 6:00 a.m. to 10:00 p.m. ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to any United States Magistrate Judge on criminal duty in the District of Arizona.

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized ☐ for _30_ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____.

Date and time issued: 10-4-2024 at 9:35am _____
Judge's signature

City and state: Yuma, Arizona_____        Honorable James F. Metcalf, U.S. Magistrate Judge_____
Printed name and title

## ATTACHMENT A

a. Cellular tower data located within a 30 mile radius of (GPS) coordinates 32.56640, -114.43505. These records are stored at premises controlled by Verizon Wireless, headquartered at 180 Washington Valley Road, Bedminster, NJ 07921; AT&T Mobility, headquartered at 11760 US Highway 1, Suite 600, North Palm Beach, FL 33408; and T-Mobile USA, headquartered at 4 Sylvan Way, Parsippany, NJ 07054.

This warrant authorizes the forensic examination of the Cellular Tower Data for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.    All records on the Cellular Tower Data described in Attachment A that relate to violations of Title 8 U.S.C. § 1324 (Bringing in and Harboring Certain Aliens), including:

   a. To the extent that the information described in Attachment A is within the possession, custody, or control of the Service Providers, including any information that has been deleted but is still available to the Service Providers or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Providers is required to disclose to the government the following information pertaining to the Account listed in Attachment A for the time period January 1, 2024 to September 30, 2024:

      i. All records and other information (not including the contents of communications) about all communications made using the cell tower during the corresponding timeframe listed in above, including the records that identify:

         a. The telephone call number and unique identifiers for each wireless device in the vicinity of the tower ("the locally served wireless device") that registered with the tower, including Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers the telephone call number and unique identifiers for each wireless device in the vicinity of the tower ("the locally served wireless device") that registered with the tower, including Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), and International Mobile Equipment Identities ("IMEI");

         b. The source and destination telephone numbers associated with each communication (including the number of the locally served wireless device and the number of the

telephone that called, or was called by, the locally served wireless device);

**c.** The date, time, and duration of each communication, and records of temporarily assigned network addresses (such as Internet Protocol ("IP") addresses);

**d.** The "sectors" (i.e., the faces of the towers) that received a radio signal from each locally served wireless device; and

**e.** The type of communication transmitted through the tower (such as phone call or text message).

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by VERIZON WIRELESS, and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of VERIZON WIRELESS. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of VERIZON WIRELESS, and they were made by VERIZON WIRELESS as a regular practice; and

b.      such records were generated by VERIZON WIRELESS's electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of VERIZON WIRELESS in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by VERIZON WIRELESS, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____          _____
Date                                             Signature

3

# CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by AT&T MOBILITY, and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of AT&T MOBILITY. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)].** I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of AT&T MOBILITY, and they were made by AT&T MOBILITY as a regular practice; and

b.      such records were generated by AT&T MOBILITY's electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of AT&T MOBILITY in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by AT&T MOBILITY, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.


_____        _____
Date                                            Signature

4

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by T-MOBILE USA, and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of T-MOBILE USA. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

a.　　all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of T-MOBILE USA, and they were made by T-MOBILE USA as a regular practice; and

b.　　such records were generated by T-MOBILE USA's electronic process or system that produces an accurate result, to wit:

1.　　the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of T-MOBILE USA in a manner to ensure that they are true duplicates of the original records; and

2.　　the process or system is regularly verified by T-MOBILE USA, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____　　　_____
Date　　　　　　　　　　　　　　Signature

5

AO 106 Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
District of Arizona

IN THE MATTER OF THE SEARCH OF CELLULAR
TOWER DATA ASSOCIATED WITH THE MEXICAN
CELLULAR TELEPHONE NUMBER 525624603391
AND REGISTERED TO JOSE ANTONIO RAMOS-
LEON  CURRENTLY  LOCATED  IN  THE
POSSESSION OF AT&T MOBILITY, T-MOBILE USA,
SPRINT AND VERIZON WIRELESS.

Case No.  24 - 2395 MB

**APPLICATION FOR A SEARCH WARRANT**

I am a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

**As further described in Attachment A.**

located in the District of Arizona there is now concealed:

**As set forth in Attachment B.**

The basis for the search under Fed. R. Crim. P. 41(c) is:

☒ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code/Section | Offense Description |
|---|---|
| 8 U.S.C. § 1324 | Bringing in and harboring certain aliens |

The application is based on these facts:

**See attached Affidavit of HSI Special Agent Rebekah Stanley**

☒ Continued on the attached sheet.
☐ Delayed notice of _30_ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA Louie Uhl

REBEKAH R STANLEY   Digitally signed by REBEKAH R STANLEY
Date: 2024.10.03 14:11:17 -07'00'

*Applicant's Signature*

Rebekah Stanley, Special Agent, HSI
*Printed name and title*

Subscribed and sworn to telephonically.

Date: ___10 - 4 - 2024___

*Judge's signature*

Honorable JAMES F. METCALF, U.S. Magistrate Judge
*Printed name and title*

City and state: Yuma, Arizona

## ATTACHMENT A

a. Cellular tower data located within a 30 mile radius of (GPS) coordinates 32.56640, -114.43505. These records are stored at premises controlled by Verizon Wireless, headquartered at 180 Washington Valley Road, Bedminster, NJ 07921; AT&T Mobility, headquartered at 11760 US Highway 1, Suite 600, North Palm Beach, FL 33408; and T-Mobile USA, headquartered at 4 Sylvan Way, Parsippany, NJ 07054.

This warrant authorizes the forensic examination of the Cellular Tower Data for the purpose of identifying the electronically stored information described in Attachment B.

## **ATTACHMENT B**

1.    All records on the Cellular Tower Data described in Attachment A that relate to violations of Title 8 U.S.C. § 1324 (Bringing in and Harboring Certain Aliens), including:

    a. To the extent that the information described in Attachment A is within the possession, custody, or control of the Service Providers, including any information that has been deleted but is still available to the Service Providers or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Providers is required to disclose to the government the following information pertaining to the Account listed in Attachment A for the time period January 1, 2024 to September 30, 2024:

        i. All records and other information (not including the contents of communications) about all communications made using the cell tower during the corresponding timeframe listed in above, including the records that identify:

            **a.** The telephone call number and unique identifiers for each wireless device in the vicinity of the tower ("the locally served wireless device") that registered with the tower, including Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers the telephone call number and unique identifiers for each wireless device in the vicinity of the tower ("the locally served wireless device") that registered with the tower, including Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), and International Mobile Equipment Identities ("IMEI");

            **b.** The source and destination telephone numbers associated with each communication (including the number of the locally served wireless device and the number of the

telephone that called, or was called by, the locally served wireless device);

    c. The date, time, and duration of each communication, and records of temporarily assigned network addresses (such as Internet Protocol ("IP") addresses);

    d. The "sectors" (i.e., the faces of the towers) that received a radio signal from each locally served wireless device; and

    e. The type of communication transmitted through the tower (such as phone call or text message).

2

# CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by VERIZON WIRELESS, and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of VERIZON WIRELESS. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

a. all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of VERIZON WIRELESS, and they were made by VERIZON WIRELESS as a regular practice; and

b. such records were generated by VERIZON WIRELESS's electronic process or system that produces an accurate result, to wit:

1. the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of VERIZON WIRELESS in a manner to ensure that they are true duplicates of the original records; and

2. the process or system is regularly verified by VERIZON WIRELESS, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____        _____
Date                                                         Signature

3

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by AT&T MOBILITY, and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of AT&T MOBILITY. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)].** I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of AT&T MOBILITY, and they were made by AT&T MOBILITY as a regular practice; and

b.      such records were generated by AT&T MOBILITY's electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of AT&T MOBILITY in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by AT&T MOBILITY, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____    _____
Date                         Signature

4

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC
## RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE
## 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by T-MOBILE USA, and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of T-MOBILE USA. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

a.    all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of T-MOBILE USA, and they were made by T-MOBILE USA as a regular practice; and

b.    such records were generated by T-MOBILE USA's electronic process or system that produces an accurate result, to wit:

1.    the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of T-MOBILE USA in a manner to ensure that they are true duplicates of the original records; and

2.    the process or system is regularly verified by T-MOBILE USA, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____          _____
Date                                                         Signature

5

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Rebekah Stanley, being first duly sworn, hereby depose and state as follows:

## SUMMARY

This Affidavit supports an application for a search warrant to obtain historical cell site information relating to and associated with a cellular telephone number utilized by Jose Antonio RAMOS-Leon (RAMOS) leading to his death in the desert in Yuma County on or about September 1, 2024. RAMOS used a cellular telephone to communicate with members of Alien Smuggling Organization (ASO) to transport him into the United States on or about August 31, 2024, in violation of 8 U.S.C. § 1324 (Bringing in and Harboring Certain Aliens) into and through Yuma County, Arizona, within the District of Arizona during the relevant time period. Arrangers and recruiters for an ASO typically reside in Mexico, outside of the U.S. and search for clients for the ASO. The ASO may require prepayment of part or all of a client's smuggling fees. The arranger/recruiter may be independent contractors or may work exclusively for one ASO, travel to a source country or be in source country and utilize their local business or residence to receive prospective travelers. An arranger/recruiter may arrange transport of clients to the U.S. or may be found waiting at transportation areas such as bus stations or airports to recruit clients for the ASO. A foot guide typically works along the border between Mexico and the U.S, leading clients across the border to a pre-arranged location within the U.S. to await pickup or transport to preordained stash houses within the U.S. Foot guides typically maintain contact with drivers and stash house operators by cell phone to coordinate movements and pickups.

## INTRODUCTION AND AGENT BACKGROUND

1.    I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property; specifically, cellular tower data located within a 30-mile radius of global positioning system ("GPS") coordinates 32.56640, -114.43505 ("Cellular Tower Data"), and the extraction from the Cellular Tower Data of electronically stored information of the type described in Attachment B.    The Cellular Tower Data is currently in the possession of the following cellular service providers: AT&T Mobility, T-Mobile USA and Verizon Wireless.

2.    I am a Special Agent ("SA") with Homeland Security Investigations ("HSI") assigned to the Office of the Assistant Special Agent in Charge, Yuma, Arizona. I have been so employed since September 2023, and I am currently assigned to the Border Enforcement Security Task Force Unit. I am a graduate of the Criminal Investigator Training Program and Homeland Security Investigations Special Agent Training (HSISAT) at the Federal Law Enforcement Training Center (FLETC).    I received specialized training to include, but not limited to:  investigating violations of federal law relating to human smuggling, as well as training in drug smuggling, drug identification, immigration law, defensive tactics, firearms, and criminal law.  I am an investigative law enforcement officer of the United States within the meaning of Title 18 United States Code, Section 2510(7), and empowered by law to conduct

investigations and to make arrests for offenses enumerated in Title 8, United States Code, Section 1324. Prior to my employment as a Special Agent with Homeland Security Investigations, I was employed as a police officer with the Beaumont Police Department and a Special Investigator with the State of Texas. My educational background includes a Bachelor of Science ("BS") degree in Criminal Justice from Lamar University in 2010 and a Master of Arts ("MA") degree in Forensic Psychology from The Chicago School of Professional Psychology. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. This information comes from my investigation and from other law enforcement officers and witnesses.

3.    Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 8 U.S.C. § 1324 (Bringing in and Harboring Certain Aliens), have been committed.[1] There is also probable cause to search the information described in Attachment A for evidence of these crimes as further described in Attachment B.

**INFORMATION TO BE DISCLOSED BY THE SERVICE PROVIDERS**

4.    The information to be disclosed is:

---

[1] RAMOS is now deceased. He could not be charged with "smuggling himself" even if alive; however, as a smuggled alien, he obviously played an integral role in his own smuggling. This search warrant is submitted to obtain information regarding those who smuggled RAMOS, who *can* possibly be charged with a violation of 8 U.S.C. § 1324 (Bringing in and Harboring Certain Aliens). Submitting this search warrant is the quickest and most efficient way of hopefully obtaining evidence leading to the discovery and conviction of those who smuggled RAMOS into the U.S. in violation of that statute and left him to die alone and abandoned in the most treacherous desert in the western hemisphere.

3

a. Cellular tower data located within a 30-mile radius of GPS coordinates 32.56640, -114.43505. These records are stored at premises controlled by Verizon Wireless, headquartered at 180 Washington Valley Road, Bedminster, NJ 07921; AT&T Mobility, headquartered at 11760 US Highway 1, Suite 600, North Palm Beach, FL 33408; and T-Mobile USA, headquartered at 4 Sylvan Way, Parsippany, NJ 07054.

This information will be referred to as the "Cellular Tower Data." Hereinafter, AT&T Mobility, T-Mobile USA, and Verizon Wireless will be referred to as the "Service Providers."

The applied-for warrant would authorize the disclosure of Cellular Tower Data from the Service Providers for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

5. On September 17, 2024, the Tucson, Arizona Mexican Consulate requested assistance from the Tucson Sector Border Patrol to investigate the whereabouts of Jose Antonio RAMOS-Leon (RAMOS), a Mexican citizen and national who had illegally entered the U.S. on or about August 31, 2024 and was reported missing by his sister, Erika Ramos-Leon (Erika) on September 9, 2024.

6. Erika told the Consulate that RAMOS had illegally entered the U.S. near San Luis Rio Colorado, Sonora, Mexico. Erika said that RAMOS was abandoned in the

4

desert with no food or water.  Erika explained that, the last that she had heard from her brother, RAMOS, he had texted her that he was going to take a nap and that he provided Erika with the coordinates to his location: 32.56640, -114.43505.  Erika provided these coordinates, along with RAMOS' cellular number: +52 (56) 2460 3391, to the Consulate. Investigators confirmed that no 911 calls were made from RAMOS' cellular number.

7.    On September 18, 2024, Border Patrol agents with Yuma Sector Foreign Operation Branch (FOB) notified Yuma Border Patrol sagents of RAMOS' disappearance, as the relevant coordinates were within the Yuma Station area of responsibility (AOR). That same day (September 18, 2024) Customs and Border Protection Air and Marine Operation (CBP AMO) assisted Yuma agents locate a cadaver believed to be RAMOS at those coordinates.  See photograph and map below.



5



8.    Law enforcement system checks for RAMOS were conducted with negative returns. System searches of RAMOS' cellular number +52 (56) 2460 3391 also failed to lead to positive results.

9.    On September 18, 2024, the Yuma County Sheriff's Office (YCSO) performed an external examination of the cadaver, dressed in a long sleeve shirt and blue jeans and in an advanced state of decomposition.  Investigators were reasonably certain that cadaver was RAMOS due to its discovery at the coordinates provided by Erika and the discovery of a Mexican Voter Registration Card bearing a photograph and RAMOS' name. The cadaver was in possession of a phone charger but no cellular phone was discovered on the body or near it. Near the cadaver was an empty water jug, a pair of boots, and a discarded shirt.

10.    A Yuma County Sheriff's Medical Examiner completed an external examination of the cadaver which is incomplete at the time of this application.

11.    On September 20, 2024, Homeland Security Investigations Special Agents arrived at coordinates 32.56640, -114.43505 where RAMOS' body was located.  Agents performed a search of the area but did not find a cellphone or any other item of evidentiary value.

12.    Investigating HIS SA Rebekah Stanley communicated with RAMOS' youngest sister, Yesica Ramos Leon (Yesica) who provided a photograph of RAMOS taken on August 31, 2024, the date of his illegal entry into the U.S.  The photograph depicts RAMOS wearing a long-sleeved navy t-shirt and blue jeans. Yesica said that

7

RAMOS left their home in San Esteban Cuautempan, Puebla, Mexico [2], on August 31, 2024 with a black backpack and a black bracelet with the letter "A" on it. Yesica said RAMOS placed clothing articles and an identification card in his backpack and took his cell phone with him. Yesica sent a photograph of that phone to SA Stanley, a circle drawn around that phone identified it as the type of phone that RAMOS took with him. Investigators identified that cell phone as OPPO Reno - Xiaomi Redmi.

13.    Yesica continued to fill in the details RAMOS' fateful voyage. She said that after RAMOS had left the family residence, he met a man who Yesica identified as Rafael HERNANDEZ-Guerrero (HERNANDEZ). Yesica explained that she knew who HERNANDEZ was because he lived in the same village. She said that HERNANDEZ was the arranger/recruiter for clients seeking illegal entry into the U.S. and tha4t he ultimately led RAMOS to his foot guide. She said that HERNANDEZ provided RAMOS with the Copple Bank card number of one Susana FONSECA-Ortiz's Coppel Bank (4169 1614 2314 4897). Yesica further explained that RAMOS made three payments on three separate occasions. The first payment was for $1500.00, Yesica said, while the second was for $2500.00. Yesica did not know when these payments occurred. Yesica explained that a third and final payment of $3000.00 was made on August 29, 2024. She added that the "tickets" (likely the receipts from the above deposits) were sent to HERNANDEZ by as "proof" of payment.

---

[2] San Esteban Cuautempan, Pueblo, Mexico, is approximately 1,600 miles from San Luis Rio Colorado, Sonora, Mexico.

14.    Yesica further explained that HERNANDEZ had arranged for RAMOS to illegally enter the U.S on three separate occasions. The first time, Yesica said that on an unknown date, HERNANDEZ introduced RAMO to a foot guide that Yesica could only identify as "Melchor".   Yesica added that three unknown males were supposed to illegally enter the U.S. with RAMOS and "Melchor".  Apparently, two were able to pay their smuggling fee but one was not.  Yesica explained that, prior to crossing, RAMOS had to pay "Melchor" 150 in Mexican pesos.[3]  Yesica added that RAMOS, "Melchor" and the three other males entered a white van and attempted to cross through mountainous terrain to the frontier with the U.S.  However, Yesica, said that the van got stuck and that the group had to return to their homes in Mexico.  Yesica said that RAMOS communicated with HERNANDEZ and "Melchor" through WhatsApp, an encrypted messaging application on electronic devices.

15.    Yesica explained the second crossing attempt made by RAMOS, "Melchor" and the three males in the same white van.  Yesica explained that, on this occasion, RAMOS was instructed to pay more money. However, Yesica said that RAMOS was unable to pay and could not cross. Yesica said that photographs and videos were sent to RAMOS as "proof" they were able to cross. Also, a message was sent to RAMOS from +52 (63) 7106 9768 on May 8, 2024, stating that "Ya yegaron;" translation: "They have already arrived." Yesica provided these photographs, videos and a photograph of the message to SA Stanley.

---

[3] Approximately $770.00.

9

16.     Yesica said that, on the night of August 31, 2024, RAMOS again ventured to illegally enter the U.S for his third and tragically final attempt.  Yesica said that RAMOS made this attempted with an unknown, different foot guide and another unknow male.  Yesica said that, on September 1, 2024 at approximately 10:00 AM, RAMOS called her.  Yesica told SA Stanley that RAMOS said that a foot guide and another male were arrested at the border when they illegally entered the U.S. but that he (RAMOS) was able to get away.  However, he said that he was lost.  RAMOS sent a photograph of a map with his location and coordinates to Yesica.  He then sent another map of his coordinates; this map had a red circle and a blue line near Highway 2.[4] The blue line was the area where he and the others had crossed prior to being apprehended.

17.     The temperature in Yuma, Arizona on August 31, 2024 was 110 degrees Fahrenheit.  The temperature on the following day, September 1, 2024, was 111 degrees. September 1, 2024, at about 7:25 PM, was the last contact that Yesica had with RAMOS when he told Yesica that he was going to go to sleep for a while because he wanted water and did not have any.  Yesica added that she did not know that her brother was "going to sleep forever."

18.     I have identified a phone number of interest, based on evidence and interviews.  I believe that this phone number was used by RAMOS during his attempts to be smuggled into the U.S. until the date of his death.  Data from the cellular towers near

---

[4] Mexican Highway 2 passes through the border states of Baja California, Sonora, Chihuahua, Coahuila, Nuevo Leon and Tamaulipas.  In the relevant area, it is just south of the border between the U.S. and Mexico.

the area, limited to a window of time before and after RAMOS' death, will potentially allow law enforcement agents to identify any other cellular phone numbers utilized, in the window of time before and after RAMOS' death, in the same area where RAMOS was discovered. Although the tower data will capture all cellular phone numbers being utilized within the specified window of time, given the rural, desert area and known crossing area for ASO, it is my belief that relevant phone numbers can be determined and isolated.

19.    On September 25, 2024, HSI Yuma Special Agents sent preservation letters to AT&T Mobility, T-Mobile USA, and Verizon Wireless to preserve the following Cellular Tower Data for a period of 90 days in relation to any information stored by the Service Providers, phone numbers active in the area, any devices that made contact with the cell tower during this timeframe, and any other records or evidence relating to the event in question.  The timeframe annotated for cellular use, was September 3-5, 2024, which was the known dates of RAMOS' entry and death at that time and was provided to the cellular telephone services in the preservation letters.

20.    I have learned throughout this investigation, along with my training and experience, that AT&T Mobility, T-Mobile USA, and Verizon Wireless are companies that provide cellular telephone access to the general public.  I also know that providers of cellular telephone service have technical capabilities allowing the collection and generation of information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell

11

tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone are connected. These towers are often a half-mile or more apart, even in urban areas, and can be ten or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

21.    I also have learned that wireless providers such as AT&T Mobility, T-Mobile USA, and Verizon Wireless typically collect and retain information pertaining to their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as AT&T Mobility, T-Mobile USA, and Verizon Wireless typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone (including the number of the telephone that called or was called by the locally served wireless device) and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the

12

information may assist in the identification of suspects and/or co-conspirators. Piecing together cell-site data from several different cell towers can determine or corroborate a phone's route of travel, pattern of calls, and time of calls, assisting with the identification of a suspect phone.

22.    In summary, there is probable cause to believe that Verizon Wireless provided service for a cellular telephone of interest during the time period identified in Attachment B; that AT&T Mobility and T-Mobile USA may have provided cellular service to another phone or phones of interest active in the area ; that the alien smuggler who was driving the vehicle utilized a cellular telephone at or near the time of the collision; and that cell-site location information for the time period identified in Attachment B is likely to constitute or lead to relevant evidence of the alien smuggling offense, insofar as it will reveal the smuggler's historical travel and communication patterns, lead to the identity of possible co-conspirators, and potentially corroborate cellular telephone data previously received pursuant to a cellular telephone search warrant.

**AUTHORIZATION REQUEST**

23.    Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 8 U.S.C. § 1324 and Federal Rule of Criminal Procedure 41.

24.    I further request that the Court direct AT&T Mobility, T-Mobile USA, and Verizon Wireless to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.  Because the warrant will

13

be served on AT&T Mobility, T-Mobile USA, and Verizon Wireless, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

25.    I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation, including by giving targets an opportunity to destroy or tamper with evidence, change patterns of behavior, notify confederates, and flee from prosecution.

Respectfully submitted,

REBEKAH R STANLEY Digitally signed by REBEKAH R STANLEY
Date: 2024.10.03 14:12:12 -07'00'

Rebekah Stanley
Special Agent
Homeland Security Investigations

Subscribed and sworn to telephonically on October __4__ 2024.

THE HONORABLE JAMES F. METCALF
UNITED STATES MAGISTRATE JUDGE

15